[Civ. No. 606.   Fourth Appellate District.—February 24, 1932.]

G. W. ARPER, Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and THOMAS GUM, Respondents.

N. B. Bachtell and Bachtell & Clanton for Petitioner.

Arthur I. Townsend for Respondents.

BARNARD, P. J.—The petitioner seeks to annul an award of the Industrial Accident Commission in favor of the respondent, Thomas Gum. On September 8, 1930, Gum was employed by the petitioner and was assisting in the repair of a pump upon premises owned by the petitioner, and on that day he sustained an injury to his left hand and forearm causing an amputation thereof about six inches below the elbow-joint. After a hearing and a rehearing, the Industrial Accident Commission awarded Gum $3,484.03 as normal compensation, and finding that the petitioner was wilfully uninsured at the time, increased the award by 10 per cent, making a total award of $3,832.43. The only defense presented by the petitioner was and is that the employment in question was excepted and excluded from the compensation provisions of the Workmen's Compensation Insurance and Safety Act, in that it was both casual and not in the course of the trade, business, profession or occupation of the employer. The Commission found that the employment in question was not casual and that it was in the course of the trade, business, profession or occupation of the employer. The only questions presented are whether these findings are supported by the evidence.

We will first consider the evidence as to whether this employment was casual, within the meaning of that term as defined in section (8) (c) of the act. The petitioner testified that the well on his premises was 288 feet deep and that he had a pump which was operated by sucker-rods which were connected with a cable; that on the occasion in question he hired Gum to reconnect these sucker-rods by repairing a broken cable; that he told Gum that "something had happened to the sucker-rods again and we would have to pull the pump and make a repair and asked if he could come out and assist in the work"; that he then contemplated that the work would take four or five days; and that he had been doing the same sort of work for years and that this was the usual length of time required. He told of three particular occasions upon which the same repair had previously been made, the last one being about a year before the one here in question, at which time the applicant Gum had also assisted in the work. At that

time the work had taken three and a half or four days and had cost a total of $49. On the last two occasions the work had been done by the petitioner himself, the applicant Gum, and one other man. Gum was paid fifty cents an hour and his dinner. The petitioner further testified that the previous breaks had been exactly similar to the one that was being repaired on this occasion, and that such a repair "never had cost over $49 in all the years I have been doing the thing". He testified that on this occasion they had raised the pump and taken out four or five joints of pipe in order to get at the break; that they had repaired the break, put the joints of pipe back, and were lowering the pipe back into the well; that they had lowered it to within six feet of the bottom when the applicant allowed it to fall, causing the injuries complained of; that it would not have taken more than a half hour additional to have completed the work, had the accident not happened when it did; and that they had worked three and one-half days when the accident occurred. He also testified that later on, with two other men, he spent several days trying to repair the damages caused by allowing the pump to fall but found the pump so badly broken that he was unable, financially, to complete the repairs. This testimony is largely confirmed by the evidence of Gum. When asked what he did on this particular occasion, he stated that he was going to repair the cable. He then testified that they took the pipe up; that "We got the cable out and rebabbitted and cut the cable off inside of the connection, that connection they have on that wire cable sucker; and we started to put it back down"; and that they were lowering the pipe when the accident happened. The applicant made the following answers to questions asked him by his attorney:

- "Q. At the time you were injured, Mr. Gum, how nearly completed was the work which you started out to do on the job?

"A. One or two links more to put on.

"Q. One or two what?

"A. Lengths of pipe."

Shortly thereafter he was asked by the referee "How long would it have taken you to have put on these two lengths of pipe that remained to be put on the pipe at the

time of your injury?" To this he replied: "Well, probably—maybe three hours." At another time, when asked how many more days it would have taken to have completed the work, he replied: "Oh, I couldn't say that; probably, from what I learned, it took ten or twelve days." The ten or twelve days here referred to was work that was subsequently done, which will hereafter be referred to in connection with the testimony of one Mullen. At another time Gum testified that the well was not dug straight, that it had many things the matter with it, and that it would have taken from three to six months to have completely fixed it. He testified that he told the petitioner of these various things and that it was a waste of time to try and fix it temporarily; that the petitioner then told him that he was unable, financially, to do all of these things and that he wanted to fix it temporarily. He testified as follows:

"Q. Then he didn't hire you to do it all?

"A. No, just temporarily to get through with it, see, but the work of fixing it would take about three months. He didn't hire me permanently there, but just to fix it as quick as I could so he could irrigate."

While he testified in response to the above question from his attorney that the work he started out to do was all completed except putting on one or two lengths of pipe, and while he told the referee that it would take probably three hours to put on the remaining pipe, Gum went on to testify that it would be necessary to put in bulkheads and line up the pipe, which would take two days; to plug up a leakage in the pipe, which would take up two days; and that it would take two more days to loosen the well derrick. When asked if he was told by the petitioner to fix these bulkheads and do this other work, he replied: "When I go to a job I go ahead and fix everything that is needed." He then admitted that the petitioner had not told him to do this work, and that he had told him that he wanted the pump fixed temporarily. It may here be observed that while the applicant testified it would take some six days to fix the bulkheads, plug the leakage and loosen the well derrick, he admitted that these same things had been done a year before when he last repaired this pump, and the uncontradicted evidence is that the entire cost of all the

work done at that time was $49, and that it took no more than four days.

■ . We think it fully appears from this evidence, especially from the evidence of the applicant, that this work was casual within the meaning of the act. While the applicant endeavored to claim that additional work was originally contemplated, his admissions show the contrary, and his own evidence is so vague, unsatisfactory and in places impossible, that it creates no substantial conflict on this point. In support of this finding, counsel for respondent relies particularly upon the following quotation from the report of the referee to the Commission: "W. M. Mullen testified that he worked for defendant on said additional work beginning about two weeks after the injury. He helped remantle said pump for 11½ days with another man named William Felton, who also worked on the job. Both men received $4.50 a day for said rigging work which consisted of raising the pump, removing the sucker cable, repairing it and the pump generally. The witness, a man of 35 years' experience in well and pump work, did not know just what work was contemplated just prior to applicant's injury but when he and Felton completed the 11½ days' work for defendant they did not finish the needed repair of said pump even then because it became too expensive for defendant to have it finished."

From this, counsel for respondent argues as follows: "It appears therefore definitely as a matter of fact that injured had worked 3½ days at the time of the injury and that it required at least 11½ more days following the previous 3½ days to complete the job.. Even then it does not appear to have been wholly completed. So much for the contention that the work contemplated did not exceed 10 days." The witness Mullen referred to, testified that some time after the pump fell into the well causing the accident here involved, he worked on the job for eleven and one-half days doing "what is known as wrecking work". He also testified that the work he was doing was incident to the pump having fallen, and being further broken a few days before. When Mullen testified that he did not know whether the sucker-rod was broken previous to the drop or not, the referee said: "I think Mr. Bachtell's objection is good as to all work made necessary by the drop of the pump, because

it is clear that that work wasn't contemplated at the time the applicant was hired. And unless you can show that, Mr. McNeil, I will sustain the objection and not hear any further testimony on this matter, with reference to the work done after the injury. The testimony should be confined to the work done on the work which was contemplated before the injury and before that drop of the pump. Now if you think you can show the materiality you mentioned a while ago, go ahead Mr. McNeil. Otherwise, I suggest passing to something more material.''

When the applicant's attorney (McNeil) failed to bring out this information, the referee said: ''It is for Mr. McNeil to state whether he can meet the objections stated a while ago, and my questions directed to the same point.''

Thereupon, the attorney replied that he had nothing further and the referee stated: ''The whole record can stand for what it is worth as it is, since I have noted my ruling on it and counsel for applicant doesn't see fit to proceed.'' It is perfectly apparent that Mullen's testimony does not establish that any work was done after the accident which was contemplated at the time the applicant was hired, and that this was fully appreciated at the time by the referee. The facts do not justify the conclusion that has been drawn by respondents' counsel, and which may have been drawn by the Commission, from the report of the referee, that Mullen's testimony established that the work contemplated required more than ten days. In our opinion, the evidence does not sustain the finding that the employment in question was not casual.

■ Taking up the question whether this employment was in the course of the trade, business, profession or occupation of the petitioner, the following facts appear: The petitioner was at the time of the accident and had been for sixteen years, in the insurance business at Mojave, California. He lived on a ranch four miles from Mojave, which was desert land and which he had homesteaded. He had farmed the place while he was proving up on it but had not farmed it since 1916. About ten acres around the house was inclosed. It was improved with a house, a well, a garage and some chicken-houses. There were also twenty-five fruit-trees used for fruit and shade around the house, which had been put out for experimental purposes. They consisted of

apricot, fig, apple, peach and several other kinds of fruit. He used the fruit himself and had never sold or contemplated selling any fruit. He had no chickens but had at the time of the accident about 200 pigeons. He formerly had had about 600 pigeons and had sold squabs, but in July, 1930, he had quit selling squabs and was selling the old pigeons as rapidly as he could. Beginning with July, 1930, he destroyed all eggs and prevented the hatching of any more squabs. He used the water from the well in question for domestic purposes and for the purpose of irrigating the trees around the house, giving some water to the pigeons. Section 8 (c) of the Workmen's Compensation Act includes the following: ''The phrase 'course of trade, business, profession or occupation of his employer' shall be taken to include all services tending toward the preservation, maintenance or operation of the business, business premises or business property of the employer. The words 'trade, business, profession or occupation of his employer' shall be taken to include any undertaking actually engaged in by him with some degree of regularity, the trade name, articles of incorporation or principal business of the employer to the contrary notwithstanding.''

We think it appears from this evidence that the service of the applicant in repairing this pump was not one tending toward the preservation, maintenance or operation of either the business, the business premises or the business property of the petitioner. The few fruit-trees were in no manner connected with any business and the fact that the petitioner owned 320 acres of desert land, which he was not farming, does not make the situation any different than would be the case where any man has a few fruit-trees around his home. If the petitioner ever could be said to have been in the business of raising pigeons, he had abandoned that business two months before this accident occurred and while he had a few grown pigeons left, we think it may not be said from the evidence that any service performed by the applicant was in furtherance of that business. Any water that the pigeons might have drunk was trivial and incidental, and, in reason and common sense, we are unable to see how it can be held that the petitioner did anything other than hire the applicant for a service upon a purely domestic well. In our opinion, the plain spirit and intent of this

act is such as to exclude from its operation such a situation as here appears.

For the reasons given, the award is annulled.

Jennings, J., and Lambert, J., *pro tem.,* concurred.